# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| DAVID DEAN MILLER, | ) | CASE NO. 3:16CV02933 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, David D. Miller ("Plaintiff") challenges the final decision of Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"), denying his applications for Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for preparation of a Report and Recommendation.  For the reasons set forth below, it is recommended that the Commissioner's final decision be AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.

1

# I.    PROCEDURAL HISTORY

On December 26, 2012, prior to filing the applications which form the basis of this appeal, Plaintiff was denied disability benefits on an earlier application.  (Tr. 119).  The ALJ in that case concluded that Plaintiff could perform a limited range of light work with additional postural and environmental limitations.  (Tr. 127).  The Appeals Council affirmed that decision on April 23, 2014.  (Tr. 138).

A few months later, in June 2014, Plaintiff filed the applications for POD and DIB which are the subject of the instant appeal.  Plaintiff alleged a disability onset date of December 27, 2012.  (Transcript ("Tr.") 246).  The applications were denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 154-55, 191).

On October 14, 2015, an ALJ held a hearing, during which Plaintiff, represented by counsel, and an impartial vocational expert ("VE"), testified.  (Tr. 9-36).  On December 16, 2015, the ALJ issued a written decision finding Plaintiff was not disabled.  (Tr. 40-57).  The ALJ' s decision became final on November 15, 2016, when the Appeals Council declined further review.  (Tr. 1-3).

On December 7, 2016, Plaintiff filed a Complaint in this Court challenging the Commissioner's final decision.  (Doc. No. 1).  The parties have completed briefing in this case. (Doc. Nos. 13, 15, 16).  Plaintiff asserts the following assignments of error:

(1)    Whether the ALJ properly evaluated all Plaintiff's impairments at Step
        Two of the sequential evaluation;

(2)    Whether the ALJ properly evaluated Plaintiff's credibility;

      (3)      Whether the ALJ properly considered relevant evidence that post-dated Plaintiff's date last insured.

(Doc. No. 13 at 2).

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Plaintiff was born on March 5, 1961, and he was 52 years-old on the date last insured, June 30, 2013, making him an individual closely approaching advanced age under social security regulations.  (Tr. 50).  He has a high school education and is able to communicate in English. (Tr. 50).  He has past relevant work as an ironworker.  (Tr. 32).

### B.   Medical Evidence

#### 1.   Evidence pre-dating the alleged onset date

On August 15, 2006, prior to the alleged disability onset date, Plaintiff presented to Paul Fenton, M.D., for an evaluation of his left hip.  (Tr. 542).  Plaintiff complained of ongoing pain in his groin over the previous few years.  (Tr. 542).  A physical examination revealed limited range of motion of the left hip and pain with internal and external rotation of the hip.  (Tr. 542). Plaintiff had good hip strength in all directions against manual resistance.  (Tr. 542).  He was diagnosed with left hip avascular necrosis, Grade III.  (Tr. 543).

On November 8, 2007, Plaintiff underwent left hip arthroplasty (i.e. a left hip replacement).  (Tr. 539).  Follow-up treatment notes dated November 26, 2007 reveal that Plaintiff's left hip was "doing well."  (Tr. 539).  On January 8, 2008, Plaintiff was doing "quite well, with minimal pain or complaint."  (Tr. 538).  On February 29, 2008, Plaintiff reported a complete resolution of his hip pain and very good ambulation.  (Tr. 537).  However, he also

3

reported that after he "threw out his back," he was having pain in his left hip with excessive limping.  (Tr. 537).

On October 7, 2008, Plaintiff reported that his left hip was "doing pretty well," with only a "little bit" of thigh pain and occasional tightness.  (Tr. 535).  Later, during a November 30, 2010 appointment, Plaintiff again reported that his left hip was doing well.  (Tr. 528).  A treatment note from December 2010 indicates a likely diagnosis of right trochanteric bursitis. (Tr. 527).

On March 8, 2012, Plaintiff had cervical spine surgery (discectomy and fusion) performed by Ashok Biyani, M.D.  (Tr. 582).  Two months post-surgery, Dr. Biyani noted that Plaintiff was doing "quite well."  (Tr. 502).  Plaintiff denied upper extremity or neck discomfort and he was "very happy with the results of his cervical surgery."  (Tr. 502).  Plaintiff's back symptoms fluctuated in intensity, but, he reported that, overall, he was making good progress with physical therapy.  (Tr. 502).  On examination, Plaintiff had normal motor strength and intact sensation in his extremities, negative straight-leg raising, and he was able to tandem walk without difficulty.  (Tr. 502).  X-rays of Plaintiff's cervical spine showed good placement of surgical hardware.  (Tr. 502).  Physical therapy notes from June 2012 revealed reduced stiffness in Plaintiff's back, and intermittent back pain.  (Tr. 584-585).  During a follow up in October 2012, Dr. Biyani observed that Plaintiff had done "quite well" following cervical surgery, but he was having increased back pain.  (Tr. 497).

Plaintiff underwent sleep studies in September and November 2012, which revealed severe obstructive sleep apnea.  (Tr. 322-323).  Plaintiff did fairly well with a trial of BIPAP therapy.  (Tr. 322-323).

4

On November 29, 2012, Plaintiff presented to Dr. Paul Fenton, M.D., for bilateral knee pain.  (Tr. 496).  Plaintiff reported that he had been experiencing knee pain for a little over one year, and he denied any specific injury or trauma.  (Tr. 496).  He stated that his right knee locked up and his left knee occasionally gave way.  (Tr. 496).  Dr. Fenton noted that Plaintiff had a history of right knee surgery for a microfracture in November 2001.  (Tr. 496).  Physical examination revealed mild effusion in his left knee, no appreciable effusion in his right knee, good active range of motion bilaterally, stable ligaments, medial and lateral joint line tenderness, and some patellofemoral crepitus, left greater than right.  (Tr. 496).  X-rays showed no evidence of acute fracture, but mild medial joint compartment space narrowing was evident.  (Tr. 496).  Dr. Fenton administered cortisone injections into Plaintiff's knees.  (Tr. 496).

**2.        Evidence from within the claim period**

On February 25, 2013, x-rays of Plaintiff's right knee showed mild swelling and edema without definitive acute process.  (Tr. 380).

On February 28, 2013, Plaintiff presented to Dr. Fenton for evaluation of both knees. (Tr. 495).  Plaintiff reported that he had fallen a week earlier and had injured his right knee.  (Tr. 495).  The right knee was bothering him medially, and the left knee was bothering him a little. (Tr. 495).  On examination, both knees had medial joint line tenderness, slight crepitation, no significant joint effusion, stable ligaments, and intact extensors.  (Tr. 495).  An x-ray revealed mild arthritis.  (Tr. 495).  Plaintiff was assessed with bilateral knee degenerative joint disease. (Tr. 495).  Cortisone shots were administered in both knees.  (Tr. 495).

On April 25, 2013, Plaintiff presented to David Vogel, M.D., complaining of back pain. (Tr. 400).  He was diagnosed with lumbar radiculopathy.  (Tr. 402).  Physical examination

5

revealed tenderness to the lumbar area with mild spasm, decreased lumbar flexion and extension, positive straight-leg raising, and an antalgic gait with radicular symptomatology. (Tr. 402).

An MRI of the lumbar spine dated May 7, 2013 revealed L4-L5 stenosis secondary to acquired and congenital etiology (stable) and L3-L4 left foraminal disc protrusion unchanged since March 20, 2010. (Tr. 321).

On May 14, 2013, Plaintiff presented to Dr. Biyani with complaints of back and left leg pain that radiated down his leg and into his toes with associated numbness and tingling.  (Tr. 494).  A physical examination revealed full motor strength, intact sensation, normal reflexes, negative straight leg raising, and an ability to stand on his heels and toes and walk in tandem line without difficulty.  (Tr. 494).  Dr. Biyani noted that, overall, Plainitff had been doing fairly well after his cervical surgery.  (Tr. 494).  Plaintiff was assessed with right sacroiliitis, lumbar radiculopathy, and lumbar disk herniation.  (Tr. 494).

On May 29, 2013, Plaintiff followed up with Dr. Fenton for an evaluation of his knees. (Tr. 493).  Dr. Fenton noted that Plaintiff was "[d]oing quite well with minimal pain or complaints."  (Tr. 493). On examination, Plaintiff had full passive and active knee range of motion, and the knees were stable and neurologically intact.  (Tr. 493).  Dr. Fenton administered cortisone injections into Plaintiff's knees.  (Tr. 493).

On June 6, 2013, Plaintiff presented to Daniel J. Pipoly, M.D., complaining of a head cold and noting symptoms of productive cough, nose and left ear pain, dizziness, fevers, low grade chills, and shortness of breath.  (Tr. 344).  Dr. Pipoly observed that Plaintiff "looks sick." (Tr. 344).  Bronchitis or pneumonia were the possible diagnoses.  (Tr. 344).  Physical examination revealed unlabored breathing, scattered wheeze and bronchial, normal breath

6

sounds, no rales, no rhonchi, no wheezing, no dullness, no flatness, and no hyperresonance.  (Tr. 346).  During a follow up on June 20, 2013, Plaintiff was feeling better.  (Tr. 340).  A physical examination of the lungs was normal.  The assessment included chronic obstructive pulmonary disease ("COPD") with acute exacerbation and a resolved lower respiratory infection.  (Tr. 343).

Physical therapy records from June 2013 show tenderness and spasms in Plaintiff's low back, sacroiliac joint, and lateral hip.  (Tr. 382-383).  Plaintiff complained of right lower extremity pain and knee pain.  (Tr. 383).

On June 26, 2013, Plaintiff presented in the emergency department complaining of right hip and right lumbar pain radiating to the right foot.  (Tr. 374).  Plaintiff reported that coughing from pneumonia one month earlier caused a flare up in his back pain; that he had stopped physical therapy; and that he was taking Vicodin for pain.  (Tr. 374).  Examination of Plaintiff's back was normal, with normal range of motion.  (Tr. 375).  Examination of Plaintiff's lower extremities revealed normal range of motion, normal strength and sensation, and tenderness to the right lateral hip.  (Tr. 375).  Neurological examination was normal, and Plaintiff had a normal gait.  (Tr. 376).

### 3.      Evidence post-dating Plaintiff's date last insured

On July 2, 2013, Plaintiff presented to Dr. Vogel complaining of continued and increased low back pain and right lower extremity discomfort.  (Tr. 492).  Plaintiff reported difficulty ambulating due to his discomfort.  (Tr. 492).  Physical examination revealed normal motor strength, intact sensation, negative straight leg raising, and normal reflexes.  (Tr. 492).

7

Emergency department records from August 23, 2013 reveal complaints of low back pain with radicular symptoms, exacerbated by sitting, bending, lifting, or twisting.  (Tr. 368).  X-rays of Plaintiff's chest showed no evidence of acute cardiopulmonary process.  (Tr. 364).

On August 28, 2013, Plaintiff followed up for another evaluation of his knees.  (Tr. 491). Dr. Fenton noted that Plaintiff had been receiving cortisone injections every three months, and that his last injection helped over "half of the time."  (Tr. 491).  Physical examination showed no effusion of either knee, intact extensor mechanisms, flexion to 125 degrees, some medial joint line pain, and intact ligaments.  (Tr. 491).  Dr. Fenton administered cortisone injections in both knees.  (Tr. 491).

On September 6, 2013, Dr. Ashok performed a right-sided lumbar hemilaminectomy surgery.  (Tr. 354).  A discharge note indicates that Plaintiff was doing well and that his right leg felt much better.  (Tr. 356).  Follow up notes dated September 19, 2013 reveal that Plaintiff had done very well since surgery and his right leg pain had improved significantly.  (Tr. 490, 514). Although the discomfort in the upper right buttock was not completely gone, Plaintiff reported that he felt much better than he did before his surgery.  (Tr. 490, 514).  Plaintiff was ambulating without difficult.  (Tr. 490, 514).

On October 17, 2013, Plaintiff had a six-week post-operative follow up.  (Tr. 489). Plaintiff reported that he had "been doing very well" since the surgery.  (Tr. 489).  He stated that his pain had "significantly improved" and was "very controlled."  (Tr. 489).  Plaintiff reported that he was not taking any pain medication or in need of any at the time.  (Tr. 489).  Dr. Biyani noted that Plaintiff did not have "any limitation with his movements at this point," and he instructed Plaintiff to follow up on an as-needed basis.  (Tr. 489).

On December 4, 2013, Plaintiff presented for follow up, reporting that cortisone injections provided almost three months relief with respect to his knees. (Tr. 488). Plaintiff noted some residual pain with weight bearing and walking activities. (Tr. 488). On examination, Plaintiff had no effusion in his knees, no medial or lateral joint line tenderness, and intact ligaments. (Tr. 488). He received cortisone injections in his knees. (Tr. 488).

On January 2, 2014, Petitioner presented with a harsh cough and was diagnosed with acute bronchitis. (Tr. 616, 619).

On March 4, 2014, Plaintiff presented for evaluation of his bilateral knees. (Tr. 487). Dr. Fenton noted that cortisone injections were reasonably effective in providing relief. (Tr. 487). Physical examination revealed no appreciable effusion, no erythema, no infection, good active range of motion, and straight leg raise with no lag bilaterally. (Tr. 487). He was assessed with bilateral knee degenerative joint disease, and he received cortisone injections. (Tr. 487) .

On June 10, 2014, Plaintiff complained of anterior pain and crunching and medial knee pain. Plaintiff reported that symptoms were worse when he first got up in the morning, but once he "gets moving things loosen up and he does better." (Tr. 510). A physical exam revealed no significant effusion of either knee, medial joint line tenderness, very mild varus deformity bilaterally, and a large amount of patellofemoral crepitation bilaterally. (Tr. 510). X-ray imaging showed spurring under the patella and trochlea with medial compartment narrowing consistent with arthritis. (Tr. 510).

X-rays of Plaintiff's left hand dated August 19, 2014 showed mild degenerative changes. (Tr. 605-606).

On September 10, 2014, Plaintiff reported chronic pain in both ankles, and his podiatrist noted early signs of osteophytic changes in the ankle joints bilaterally and partial subluxation of the second toe.  (Tr. 640)

Imaging of Petitioner's hand dated August 19, 2014 revealed mild degenerative changes to interphalangeal joint of the thumb.  (Tr. 606).  On September 23, 2014, Plaintiff sought treatment for hand pain and numbness.  (Tr. 688).  On October 3, 2014, EMG and nerve conduction studies were normal.  (Tr. 682-683).  On November 13, 2014, Plaintiff complained of right hand pain.  (Tr. 645).  On examination, he exhibited right hand tenderness and clicking of his right thumb.  (Tr. 645).  X-rays of the right hand showed mild degenerative changes with no evidence of acute fracture of other acute findings.  (Tr. 648-649).  On December 11, 2014, Plaintiff presented with stiffness in his joints, and, in particular, he noted painful and stiff hands. (Tr. 661).  X-rays of his ankles showed mild degenerative changes.  (Tr. 671).  On February 12, 2015, Plaintiff again complained of joint and hand pain.  (Tr. 657).

On February 12, 2015, Petitioner presented to rheumatology specialist Mohammed A. Abusamieh, M.D., complaining of pain and stiffness in his joints, hands, lower back, and knees. (Tr. 657).  He reported numbness and tingling in both hands.  (Tr. 657).  Dr. Abusamieh diagnosed generalized arthritis of the hand, carpal tunnel syndrome, localized osteoarthritis of the ankle and foot, and lumbar spondylosis.  (Tr. 659).  An EMG study dated March 10, 2015 was consistent with a right mixed motor sensory median neuropathy without signs of radiculopathy or myopathy.  (Tr. 675).  The study also satisfied the criteria for right carpal tunnel syndrome.  (Tr. 675).

10

On June 8, 2015, Plaintiff treated with Dr. Vogel for right second toe pain and right ankle pain.  (Tr. 725).  An operative report dated August 5, 2015 indicated that Plaintiff's painful second metatarsophalangeal joint pain had not responded to conservative care.  (Tr. 728).  Plaintiff was administered a Weil osteotomy of the second metatarsal of the right foot and hammertoe correction of the right second toe.  (Tr. 728)

On June 22, 2015, Petitioner treated with Dr. Vogel, and he reported that cortisone injections were not lasting as long as they had in the past.  (Tr. 699).

**C.      Opinion Evidence**

On July 28, 2014, state agency physician, Dr. Leon Hughes, M.D., reviewed Plaintiff's medical file and opined that he was capable of light work with no climbing of ladders, ropes or scaffolds; no kneeling or crawling; and avoidance of concentrated exposure to pulmonary irritants.  (Tr. 149-151).

On November 2, 2014, state agency physician, Dr. Leslie Green, M.D., reviewed Plaintiff's medical file and opined that he was capable of light work with frequent climbing of ramps and stairs; no climbing of ladders, ropes, and scaffolds; occasional kneeling, crawling and crouching; and avoidance of concentrated exposure to extreme cold, vibration, and pulmonary irritants.  (Tr. 164-166).

**D.      Hearing Testimony**

During the administrative hearing, Plaintiff testified to the following:

•      Plaintiff testified that his worst physical impairment was his neck, which caused him stiffness all the way down his arm and significant pain and discomfort.  (Tr. 11-12).  He stated that by holding his arm over his head he was provided some relief.  (Tr. 12).

11

- Plaintiff also testified that his neck symptoms were ongoing but that he had not received further treatment.  He noted continued symptoms of pain and disrupted sleep.  (Tr. 20).

- Plaintiff also testified that he was suffering from significant knee pain, which he described as "bone on bone."  (Tr. 12).

- Plaintiff indicated that he had been receiving regular ongoing injections for the previous three years.  (Tr. 14).

The ALJ concluded that Plaintiff was unable to perform past relevant work as an ironworker.  (Tr. 32).  The ALJ asked the VE to consider the following hypothetical individual:

> As of the onset date, I have a person closely approaching advanced age, such as the Claimant, with a high school education.  I'm going to start out with light work; no climbing ladders and scaffolds; no kneeling; no crawling; initially engaging in the remaining postural limitations on a frequent basis; simple, routine tasks that require little or no judgement, and can be informed -- can be performed in environments that do not require high productions quotas, and skills that can be learned in no more than 30 days; SVP-2, as stated in the DOT.

(Tr. 32).  The VE responded that such a person could perform work as a laundry folder, office helper, and repack room worker.  (Tr. 32-33).

However, the VE also testified that if the hypothetical individual were off task more than twenty percent of the work day or if such an individual were to be absent one or more days per month, the individual would be subject to reprimand and/or dismissal.  (Tr. 34, 35).  The VE also testified that Plaintiff had no transferable skills to either sedentary or light work.  (Tr. 35-36).

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments,

that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his

13

past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Plaintiff was insured on his alleged disability onset date, December 27, 2012, and remained insured through June 30, 2013, his date last insured ("DLI"). (Tr. 45). Therefore, in order to be entitled to POD and DIB, Plaintiff must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on June 30, 2013.

2.    The claimant did not engage in substantial gainful activity during the period from his alleged onset date of December 27, 2012 through his date last insured of June 30, 2013 (20 CFR 404.1571 et seq.).

3.    Through the date last insured, the claimant had the following severe impairments: degenerative disease of the lumbar and cervical spine with radiculopathy, light sacroililitis, residuals of a lumbar laminectomy, obesity and degenerative joint disease in both knees (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525 and  404.1526).

5.    After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the claimant is unable to climb ladders, ropes or scaffolds.  The claimant is unable to kneel or crawl and is limited to engaging in the remaining postural activities on a frequent basis.  In addition, the claimant is able to engage in simple, routine tasks that require little or no judgment in an environment

with no production quotas that can be learned in no more than 30 days as per the Dictionary of Occupational Titles (SVP2).

6.      Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on March 5, 1961 and was 52 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10.     Through the dated last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant was not under a disability, as defined in the Social Secmity Act, at any time from December 27, 2012, the alleged onset date, through June 30, 2013,the date last insured (20 CFR 404.1520(g)). DECISION [sic]

(Tr. 43-51).

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence

15

as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld

16

where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

## VI.  ANALYSIS

**A.      Whether the ALJ properly evaluated Plaintiff's severe impairments at Step Two of the sequential evaluation**

Plaintiff argues that the ALJ erred at Step Two[2] by failing to include Plaintiff's status-post hip replacement and his COPD among his severe impairments.  Plaintiff maintains that these impairments should have been deemed "severe," pursuant to *Drummond v. Comm'r of Social Security*, 126 F.3d 837 (6th Cir. 1997), because the ALJ who adjudicated Plaintiff's previous application for benefits found them to be such.

In *Drummond* , the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances."  *Drummond*, 126 F.3d at 842.  The plaintiff in that case was denied SSI when the ALJ determined that she retained a RFC for sedentary work.  *Drummond*, 126 F.3d. at 838.  When the plaintiff later filed a second claim for disability, a

---

[2]     At step two of the sequential evaluation, an ALJ must determine whether a claimant has a "severe" impairment.  See 20 C.F.R. §§ 404.1520(a) (40(ii) & 416.920(a)(4)(ii).  To determine if a claimant has a severe impairment, the ALJ must find that an impairment, or combination of impairments, significantly limits the claimant's physical or mental ability to do "basic work activities."  See 20 C.F.R. § 416.920(c).  The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle," *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n. 2 (6th Cir. 2007), intended to "screen out totally groundless claims."  *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985); *See also Anthony v. Astrue*, 2008 WL 508008 at * 5 (6th Cir. Feb. 22, 2008).  Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe."  SSR 96–3p, 1996 WL 374181 at *1 (July 2, 1996).

17

second ALJ found that she retained a RFC suitable for medium-level work—unlike the sedentary RFC finding of the first ALJ—and denied the second claim. *Id*. at 839. On appeal, after explaining that "*[r]es judicata* applies in an administrative law context following a trial type hearing," the Sixth Circuit held that the second ALJ was bound to the sedentary RFC determination of the first ALJ because there was no new or additional evidence of an improvement in the plaintiff's condition. *Id*. at 841–842. The court concluded that "[j]ust as a social security claimant is barred from relitigating an issue that has been previously determined, so is the Commissioner." *Id*.

In the present case, the prior ALJ concluded in a decision dated December 26, 2012, that Plaintiff's severe impairments included, "status post hip replacement, bulging discs, central canal stenosis, and chronic obstructive pulmonary disorder ("COPD")." (Tr. 125). Thus, Plaintiff argues, because the prior ALJ found status post hip replacement and COPD to be severe at Step Two, the present ALJ is bound by that prior determination. In response, the Commissioner argues that the present ALJ is not bound by the Step Two determination of the prior ALJ, because there is new evidence showing that Plaintiff had improved with respect to those two medical conditions. As explained below, the Court agrees with the Commissioner in this instance.

### 1.     Status post hip replacement

Plaintiff first argues that because there was no new and material evidence showing improvement with respect to his status post left hip replacement, pursuant to *Drummond*, *supra*, the present ALJ was bound by the prior ALJ's Step Two finding that this impairment was "severe." Plaintiff asserts that the record shows continued, ongoing, and progressively worsening hip pain throughout the claim period. In particular, he notes June 2013 emergency department

18

records showing "tenderness and swelling, right greater than left, . . . in claimant's low back, SI joint, and lateral hip."  (Doc. No. 13 at 12) (citing Tr. 374).  Plaintiff further points out that he was "subsequently noted as suffering from right low back and hip pain with radiation of symptoms to the right posterior foot."  (Doc. No. 13 at 12) (citing Tr. 527).  Based on this evidence, Plaintiff maintains that the condition of his hip had not changed and that, as a consequence, the ALJ here was bound by the previous ALJ's finding that status post hip replacement was a severe impairment at Step Two.

The Court disagrees.  As correctly described in the administrative decision, "there is new and material evidence that warrants finding different severe impairments and a change in the claimant's residual functional capacity through the date last insured."  (Tr. 43).  Substantial evidence supports this conclusion, and the ALJ was not bound by the previous ALJ's finding at Step Two.  The Court's review of evidence reveals that Plaintiff had a *left* hip replacement in November 2007, and, on December 26, 2012, the first ALJ determined that Plaintiff's severe impairments included "status post hip replacement" as a result of avascular necrosis in the *left* hip.  However, the evidence now being cited by Plaintiff does not relate to his left hip.  The evidence relates to the *right* hip only, and, contrary to Plaintiff's suggestion (i.e. "tenderness and swelling, right greater than left"), the evidence contains no mention of the left.  For instance, the June 2013 emergency department note describes the history of Plaintiff's condition as follows:

> Dr. Graff initially evaluated pt. in ED at 1536.  Pt came to ED with c/o R lower back/hip pain radiating to R posterior foot.  Pt had pneumonia 1 month ago and cough causing flare up of back pain.  Pt dx with bursitis of R hip and says he has f/u appointment next Wednesday.

(Tr. 374).  And, under the heading "location," the emergency doctor indicated "symptoms are localized to the back right lumbar region, R hip."  (Tr. 374).  Although Plaintiff asserts that his

symptoms had "spread" from his left hip to his right hip, Plaintiff cites no expert, evidentiary, or legal support for the idea that status post hip replacement symptoms can "spread" from one hip to the other, nor is there any support for the idea that the existence of a *right* hip replacement provides support for the existence of status post *left* hip replacement.  In any event, even if Plaintiff had demonstrated all of the above, the recent medical records now being cited by Plaintiff provide a diagnosis of bursitis, not status post hip replacement or avascular necrosis (which was the underlying condition that resulted in the left hip replacement).

Furthermore, as detailed in the Commissioner's brief, the evidence establishes that Plaintiff's status post left hip replacement had resolved.  On November 26, 2007, Plaintiff's treating surgeon evaluated his left hip and noted he was "doing well."  (Tr. 539).  On January 8, 2008, the doctor indicated that Plaintiff was doing "quite well, with minimal pain or complaint." (Tr. 538).  On February 29, 2008, Plaintiff reported "complete resolution of his hip pain" and he was ambulating very well until he threw out his back.  (Tr. 537).  On October 7, 2008, Plaintiff reported that his left hip was "doing very well" with only a "little bit" of thigh pain and occasional tightness.  (Tr. 535).  On November 30, 2010, Plaintiff reported that his left hip was "doing well."  (Tr. 528).  From that time forward, none of the medical evidence reveals a single complaint or reference, positive or negative, to Plaintiff's *left* hip.  Given the foregoing, the Court concludes that substantial evidence supports the ALJ's Step Two finding that circumstances had changed and status post hip replacement no longer qualified as a severe impairment.

20

2.      **COPD**

Plaintiff also maintains that the ALJ erred by failing to include COPD among his severe

impairments.  In this regard, the ALJ reasoned as follows:

> The claimant has the following non-severe impairments, bronchitis and sleep apnea.
> The prior ALJ found that the claimant suffered from chronic obstructive pulmonary
> disease (COPD) (Exhibit Cl A-7).  In June 2013, the claimant contracted acute
> bronchitis that doctors suspected was pneumonia (Exhibit C3F-1, 5). The claimant was
> treated with a prednisone burst and medication (Exhibit C3F-l).  Within two weeks, the
> claimant reported breathing comfortably (Exhibit C3F-1).  X-rays of the claimant's chest
> taken in August 2013 revealed no evidence of cardiopulmonary process (Exhibit
> C6F-9).  In January 2014, the claimant suffered from another episode of acute bronchitis
> that was treated with antibiotics (Exhibit C7F-4).    The medical records throughout the
> period at issue tended to show normal breathing.  Given the negative x- rays findings,
> the claimant's bronchitis and history of COPD is found to be non-severe.

(Tr. 46).

Plaintiff maintains that this reasoning is in error because his treatment record shows that

he continued to suffer from exacerbations and general symptoms of COPD throughout the claim

period.  In support, Plaintiff cites a treatment record from July 2012 which notes chronic

bronchitis, asthma, COPD, and wheezing.  (Tr. 453).  Records dated June 6, 2013 show shortness

of breath, wheezing, and cough.  (Tr. 344).  On June 20, 2013, Plaintiff was diagnosed with

probable pneumonia.  (Tr. 340).  A treatment note following the claim period, from January 2,

2014, reveals complaints of cough and a diagnosis of acute bronchitis.  (Tr. 388, 381).  A

December 11, 2014 treatment note indicates decreased exercise tolerance, difficulty breathing,

and wheezing.  (Tr. 661).  In July 2015, Plaintiff was being treated with medication for COPD.

(Tr. 715).  Plaintiff maintains that this evidence establishes that he continued to suffer from

COPD.  As a consequence, he argues, the ALJ should be bound by the previous ALJ's finding

that COPD was a severe impairment.

21

The Court disagrees, and substantial evidence supports the ALJ's finding that COPD was not a "severe impairment" for purposes of Step Two of the sequential evaluation, and the evidence cited by Plaintiff does not warrant reversal.  First, the treatment note from July 2012 predates Plaintiff's onset date, and while Plaintiff at that time reported a history of chronic bronchitis, asthma, COPD, and wheezing, a physical examination revealed "quiet, even and easy respiratory effort with no use of accessory muscles."  (Tr. 454).  Plaintiff's breath sounds were normal.  (Tr. 454).  Similarly, the treatment note from December 11, 2014, while showing a subjective report of decreased exercise tolerance, difficulty breathing, and wheezing, indicates that on physical examination Plaintiff had normal breath sounds with no abnormalities.  (Tr. 662).  Finally, the treatment note from July 2015, which post-dates Plaintiff's date last insured by over two years, reveals "no respiratory distress, normal respiration rate and effort and clear bilateral breath sounds."  (Tr. 715).

Moreover, the evidence cited by the ALJ amounts to "substantial evidence" to support her conclusion that COPD was not a "severe impairment."  As noted by the ALJ, although his doctor suspected pneumonia in June 2013, after receiving treatment, Plaintiff's condition had resolved and a physical examination of Plaintiff's lungs was normal.  (Tr. 342).  A chest x-ray dated August 23, 2013 was normal and it revealed "no evidence for an acute cardiopulmonary process."  (Tr. 364).  In addition, the ALJ correctly pointed out that throughout the claim period, the medical records showed overall normal lung function.  (Tr. 342, 346, 375, 371).

Based on the foregoing, the Court concludes that substantial evidence supports the ALJ's finding that Plaintiff's status post hip replacement and COPD were not a severe impairments under the regulations.

**B.      Whether the ALJ properly evaluated Plaintiff's credibility**

Next, Plaintiff argues that the ALJ erred by failing to properly evaluate his subjective complaints of pain.  In particular, Plaintiff maintains that the ALJ should have given more credence to Plaintiff's complaints about his back and knee impairments.

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs*., 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 248 (6th Cir. 2007) ("noting that "credibility determinations regarding subjective complaints rest with the ALJ").  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs*., 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight."  SSR 96–7p, Purpose Section, 1996 WL 374186 (July 2, 1996); *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").[3]

To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* 20 C.F.R. §404.1529; SSR 96–7p, Purpose, 1996 WL 374186 (July 2, 1996).

---

[3] SSR 16-3p similarly provides that an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029 at *9.

Beyond medical evidence, there are seven factors that the ALJ should consider.[4]  The ALJ need

not analyze all seven factors, but should show that he considered the relevant evidence.  *See*

*Cross*, 373 F. Supp.2d at 733; *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

   Here, Plaintiff fails to establish the ALJ erred in assessing his credibility with respect to

his back and knee complaints.  And, upon due consideration, the Court concludes that, consistent

with the authorities cited above, the ALJ adequately explained and supported her decision to

discredit Plaintiff's subjective allegations of disability.  Although the ALJ found that there was

objective medical evidence of Plaintiff's knee and back conditions, she first noted that there was

little evidence between the date of the last ALJ decision and Plaintiff's date last insured.  "The

absence of sufficient objective medical evidence makes credibility a particularly relevant issue,

and in such circumstances, this court will generally defer to the Commissioner's assessment when

it is supported by an adequate basis."  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.

1997).

   In this case, evidence from the relevant period reasonably supports the ALJ's decision to

discount Plaintiff's subjective claims of pain.  For instance, Plaintiff presented to Dr. Fenton

---

[4] The seven factors are: (1) the individual's daily activities; (2) the location, duration,
frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate
the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication
individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other
than medication, the individual receives or has received for relief of pain or other
symptoms; (6) any measures other than treatment the individual uses or has used to
relieve pain or other symptoms; and (7) any other factors concerning the individual's
functional limitations and restrictions due to pain or other symptoms.  *See* SSR 96–7p,
Introduction and SSR 16-3p, 2016 WL 1119029 at * 7; *see also Cross v. Comm'r of Soc.
Sec*., 373 F.Supp.2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified
statement, should explain his or her credibility findings in terms of the factors set forth in
the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

twice with respect to his knees, once in February 2013 and again in May 2013.  Although the first physical examination revealed some slight crepitation and medial joint line tenderness, the second showed Plaintiff was doing well with minimal pain and complaints.  Physical examination was normal. (Tr. 493, 495).  On both occasions, cortisone shots were administered, which, as Plaintiff reported, afforded him relief for three months.  (Tr. 487, 491, 494, 496, 510).  When Plaintiff presented to Dr. Biyani in May 2013, he complained of back and radiating left leg pain, but a physical examination revealed full motor strength, intact sensation, normal reflexes, negative straight leg raising, and an ability to stand on his heels and toes and walk without difficulty.  (Tr. 494).  An x-ray of the cervical spine showed good position of the hardware and graft.  No acute fractures, dislocations, or bony processes were noted.  (Tr. 494).  A June 26, 2013 physical examination of Plaintiff's back was normal with normal range of motion.  An exam of his lower extremities revealed normal range of motion, normal strength and sensation, and tenderness to the right lateral hip.  (Tr. 375).  An upper extremity exam was also normal. (Tr. 375).  Plaintiff had a normal gait and no neurological deficits.  (Tr. 376).

Additionally, as noted by the ALJ, evidence post-dating Plaintiff's date last insured failed to provide strong support for Plaintiff's subjective claims of disability.  For example, on July 2, 2013, despite complaints of discomfort, a physical examination of the lower extremities revealed normal motor strength, intact sensation, negative straight leg raising, and normal reflexes.  (Tr. 492).  And on September 9, 2014, Plaintiff  received cortisone injections in both knees which were reportedly helpful with his arthritic symptoms.  (Tr. 638).

The foregoing evidence amounts to substantial evidence that reasonably supports the ALJ's decision to afford Plaintiff's subjective complaints less than full credence.  Although

Plaintiff cites other evidence that may reasonably support his position, under the applicable standard, the Court does not review *de novo* or reweigh the evidence. The pertinent question is whether is whether substantial evidence supports the Commissioner's conclusion – that is, whether there exists "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241.  Thus, even if the evidence could support another conclusion, this Court will not reverse the Commissioner's decision if the evidence reasonably supports the conclusion reached.  *Id.*  Assuming Plaintiff is correct that the evidence he cites supports his credibility argument, it will not affect the Court's decision, so long as there is substantial evidence to support the Commissioner's contrary conclusion.  Therefore, because substantial evidence supports the ALJ's credibility finding, the Court must accept it.

**C.      Whether the ALJ properly considered all the evidence**

Finally, Plaintiff maintains that the ALJ failed to properly consider all relevant evidence post-dating his date last insured ("DLI")—June 30, 2013.  Under the regulations post-DLI medical records may only be considered if they relate back to Plaintiff's condition before his DLI.  *See Wirth v. Comm'r of Soc. Sec.*, 87 F. App'x 478, 480 (6th Cir. 2003) ("Post-expiration evidence must relate back to the claimant's condition prior to the expiration of her date last insured.") (citing *King v. Sec'y of Health and Human Servs.*, 896 F.2d 204, 205–06 (6th Cir.1990)).  In the present case, the ALJ concluded that "[t]he evidence regarding claimant's ankles, feet and carpal tunnel syndrome does not relate back to the period before the date last insured as those impairments were relatively mild and diagnosed long after the date last insured." (Tr. 48). Plaintiff contends that the ALJ erred as the record establishes that the symptoms of the

ankle, feet, and carpal tunnel were ongoing during the claim period.  As such, Plaintiff maintains, post-DLI evidence of these symptoms should have been considered.

The Court disagrees.  As for his hand dysfunction, Plaintiff references post-DLI evidence that he contends relates back to the claim period.  However, he cites no evidence from the claim period itself to which that post-DLI evidence might relate.  As noted by the Commissioner, the earliest evidence relating to Plaintiff's hand was a treatment note from August 2014 (which post-dates the DLI by over a year) which showed mild degenerative changes to the left hand.  (Tr. 605-606).  Even later, in September 2014, Plaintiff was treated for hand pain and numbness, but EMG and NCS studies were normal at that time.  Based on the foregoing, it is not evident that Plaintiff's hand dysfunction was an ongoing condition during the claim period.  As such, the ALJ did not err by failing to consider the post-DLI evidence cited by Plaintiff.

With respect to the ankle and foot symptoms, Plaintiff maintains that the ALJ should have considered post-DLI evidence that includes a 2014 treatment note showing findings of osteophytic changes in the bilateral ankles (Tr. 640); a note dated February 12, 2015 showing a diagnosis of localized primary osteoarthritis of the foot/ankle (Tr. 659); and a June 2015 treatment note indicating Plaintiff's subjective complaints of ankle pain (Tr. 725).  Plaintiff argues that this post-DLI evidence relates back to the foot and ankle symptoms he was experiencing during the claim period.  In particular, he notes that during the claim period he suffered from back and left leg pain that radiated down his left and into his toes.  (Tr. 495).  He also notes an associated numbness and tingling during the claim period.  (Tr. 495).  In light of the foregoing, Plaintiff argues that his ankle osteoarthritis from 2014 and 2015 relates back the

27

radicular symptoms he was experiencing in his toes during the claim period.  (Doc. No. 13 at 18-19).

The Court is not persuaded.  Plaintiff fails to establish that the post-DLI evidence from 2014 and 2015 relates back to the claim period.  The cited treatment notes from the claim period establish that Plaintiff's symptoms of the feet were the result of radicular pain/numbness originating with the back and leg, and, notably, Plaintiff's severe impairments in the instant case include back pain with radicular symptoms.  On the other hand, the evidence indicates that Plaintiff's post-DLI symptoms of the feet resulted from "localized primary osteoarthritis."  Plaintiff presents no evidence or argument to establish that radicular symptoms originating with the back and osteoarthritis of the ankle are equivalent.  In the absence of some additional evidence or relevant expert opinion connecting the two sets of evidence, the Court is unpersuaded that Plaintiff's post-DLI osteoarthritis relates back to the radicular symptoms he was experiencing during the claim period.  As such, the Court concludes that the ALJ did not err when she declined to consider post-DLI evidence of osteoarthritis of the ankle.

//

//

//

//

//

//

//

//

//

28

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's

final decision be AFFIRMED.

                                                 _s/Jonathan D. Greenberg_
                                                 Jonathan D. Greenberg
                                                 United States Magistrate Judge

Date: October 26, 2017

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

29